IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN P. CONTO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1509 |
| | ) | Judge Nora Barry Fischer |
| | ) | |
| NORFOLK SOUTHERN | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Plaintiff Brian P. Conto ("Plaintiff") filed this civil action against Defendant Norfolk Southern Corporation ("Defendant"), alleging violations of the Americans with Disabilities Act, Title I, 42 U.S.C. §12117(a), incorporating by reference Section 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5; 28 U.S.C. §§1331 ("ADA") and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §955(a) *et seq.* ("PHRA"). At the time of filing, this case was assigned to Judge Hardiman. (Docket No. 1). Defendant filed a Motion for Summary Judgment on September 12, 2006, and the Court held oral argument on February 9, 2007 at which time the case was taken under advisement. (Docket No. 23, 32). This case was then reassigned to Judge Nora Barry Fischer on April 6, 2007. On June 6, 2007, the Court ordered additional briefing concerning the issues in the pending Motion for Summary Judgment given the age of the initial briefing. (Docket No. 36). Accordingly, Defendant's Motion for Summary Judgment was not fully presented to this Court until the additional briefing was received on June 21, 2007. (Docket No. 38).

### I. FACTUAL BACKGROUND

Plaintiff, Brian Conto, age 41, is a mechanic with education through the high school level.[1]  On October 21, 2004, Plaintiff submitted an application for employment with Defendant.  (Docket No. 27 at ¶ 7).  When Plaintiff applied for the position with Defendant, he was working as an automotive mechanic at #1 Cochran Robinson Township location.  *Id.* at ¶8.  Plaintiff had worked for Cochran since February, 2003.  *Id.* at ¶ 9.  In all, he had worked as an automotive mechanic for approximately ten years by the time he applied to Defendant.  *Id.* at ¶ 10.  As a mechanic, he works with power tools and is required to work at heights to diagnose problems with automobiles.  *Id.* at ¶ 11.  Plaintiff contends that this is similar to the work he would have performed for Defendant.  *Id.* at ¶ 11.  For five years prior to when he became a mechanic, Plaintiff worked as a common laborer.  *Id.* at ¶ 12.  Plaintiff applied to Defendant because he wanted better working conditions than what he had at Cochran and other locations where he worked as an automotive mechanic.  *Id.* at ¶ 13.  Specifically, Plaintiff wanted to get away from the "flat rate" bidding system that was customary at the automotive garages where he had worked.  *Id.* at ¶ 14.  This bidding system could result in Plaintiff being required to be in the garage all day but receive no work and consequently not be paid for that day.  *Id.* at ¶ 15.

At the time Plaintiff applied for a position with Defendant, he had a significant medical history.  *Id.* at ¶16.  In 1989, Plaintiff underwent a liver transplant necessitated by the fact that he suffered from Budd-Chiari Syndrome.[2]  (Docket No. 24 at ¶ 3).  Plaintiff has a history of back pain for which he began treatment in 2000, initially as the result of a motor vehicle accident.  *Id.* at ¶ 5).  In addition, Plaintiff also suffers from

---

[1]The highest level of education that Plaintiff has completed is high school. After high school, Plaintiff took a nine month course in automotives and received a welding certificate. (Docket No. 28 at p. 20).  His application for employment reflects academic excellence awards in school.  (Docket No. 24-2 at 44).

[2]Budd Chiari Syndrome is defined as symptomatic obstruction or occlusion of the hepatic veins, causing hepatomogaly, abdominal pain and tenderness, intractable ascites, mild jaundice, and eventually, portal hypertension and liver failure. *Dorland's Illustrated Medical Dictionary* 1850 (31st ed. 2007).

ulcerative colitis, hypertension, and migraine headaches.  *Id.* at ¶ 8.  At the time of Plaintiff's deposition on

April 20, 2006, he was taking two narcotic pain medications, MS Contin or Oramorph and Vicodin, and four

additional medications as a result of his liver transplant, namely Cyclosporin, Coumadin, Prednisone, and

Trimeth-Sulfo.  *Id.* at ¶ 4.  Despite all of his medical conditions, Plaintiff claims that he is not substantially

limited in major life activities.  *Id.* at ¶ 9.   In fact, Plaintiff avers in his Complaint that he had worked as a

machinist for more than twelve years.  (Docket No. 10 at ¶ 6).  He also avers that he was capable of

performing all functions of the position he sought from Defendant without accommodation.  *Id.* at ¶ 16.

Since returning to work from his liver transplant, Plaintiff has had no period of disability or period of time

when he was unable to work because of his health.  (Docket No. 27 at ¶ 22).  Moreover, his back pain has

not prohibited him from functioning or working as a mechanic.  *Id.* at ¶ 50.  He also avers that he was capable

of performing all functions of the position he sought from Defendant with or without accommodation.  *Id.*

at ¶ 16.

     The application that Plaintiff filled out was dated October 21, 2004 and contained the following

statement:

> I understand that my application for employment may be rejected or if I
> am then an employee that my employment may be terminated if it is
> determined at any time through investigation or otherwise that any untrue
> or misleading statements were made in this application or material
> information is omitted.  If offered a position I understand that I must
> successfully complete a medical examination including a drug screen,
> before employment and a classification as a regular employee depends
> upon successfully completing a probationary period.

*Id.* at ¶ 11.

     Plaintiff attended Defendant's hiring session in Greentree, Pennsylvania on November 12, 2004[3],

---

[3]

 A hiring session is a day long process where job applicants receive an orientation regarding
Defendant's company, take tests and can be interviewed for a position.  (Docket No. 27 at ¶ 52).
Plaintiff was seeking positions as a machinist, pipefitter, laborer or car repairman.  *Id.* at ¶ 53.

at which time the process for selection of machinists[4] was explained. *Id.* at ¶¶ 12,14. Scott McGrain (a former employee of Defendant) was employed as a consultant at that time and was among the human resources individuals conducting the hiring session attended by Plaintiff. *Id.* at ¶ 15. McGrain testified that those conducting the hiring session followed an orientation "script" in explaining the selection process. *Id.* at ¶ 16.

Defendant maintains that the hiring session "script" included clear directions that successful applicants at the session would be given conditional offers of employment, contingent upon them subsequently passing, in addition to a background check, a preplacement medical examination and a drug screen. (Docket No. 24 at ¶ 17). Specifically, the script stated "those applicants whom we wish to hire will receive a call within 3 to 5 business days of this session with a job offer conditional on passing a company physical, including a drug test and a police background check." *Id.* at ¶ 18. Despite the same, Plaintiff argues that it was never explained to him that successful applicants at the hiring session would be given conditional offers of employment. (Docket No. 27 at ¶ 17). Plaintiff further disputes that the employment script Defendant cites is the same script used during Plaintiff's hiring session since it's specific to **conductors**, a position for which Plaintiff did not apply and a position for which Defendant was not seeking applicants at the Greentree hiring session. (Docket No. 27 at ¶18). Moreover, the script Defendant cites makes no mention of an employee needing to undergo a sweeping medical inquiry like the one to which Plaintiff was subjected, but rather states that the applicant will need to pass a hearing test, a color blindness test and a drug screen during the physical examination. *Id.* at ¶ 18.

After taking a series of written tests on the day of the session, Plaintiff was interviewed by two individuals, Tony Stuart, and an individual whose name Plaintiff could not remember, but who was, in fact

---

[4] A machinist is what Defendant refers to as their locomotive mechanics. (Docket No. 27 at ¶54).

Scott McGrain.[5] (Docket No. 24 at ¶¶ 21-22). According to Plaintiff, Mr. Stuart told him if we are interested in you, we will call you. *Id.* at ¶ 22. He was hoping he would get a call to continue the hiring process. (Docket No. 24-2 at p. 22). Mr. Stuart called him back a few days later and indicated that if he was still interested in working for Defendant, he would be required to undergo a police background check, a drug screen, and a physical examination. *Id.* at ¶ 23. At no time was Plaintiff ever told when he would actually start working for Defendant. (Docket No. 27 at ¶ 74). Defendant insists that Tony Stuart made a contingent job offer on the same day as the interview when he told Plaintiff that, as long as he completed all three steps successfully (drug screen, background check and preplacement physical), Stuart would like Plaintiff to come to work. (Docket No. 24 at ¶ 24). Further, Plaintiff's name appeared on the list of new hires scheduled for preemployment physicals, New Hire Preemployment Physicals.[6] *Id.* at ¶25. Plaintiff admits that Stuart **claims** he made Plaintiff an offer, but argues that this offer never occurred. Further, Scott McGrain who participated in the interview does not recall Plaintiff being given a contingent job offer. (Docket No. 27 at ¶ 24).

Defendant also avers that it followed a corporate procedure concerning the employment and placement of agreement employees entitled Corporate Procedure 318.1. Pursuant to this policy, once an applicant is identified as someone that the railroad wants to hire, he or she is referred to the employing officer who makes a contingent offer of employment, then a form 4300 in an electronic database would be initiated as well as a form MED-15 for the applicants to take to a company authorized physician. (Docket No. 24 at ¶ 19). Again, Plaintiff disputes that the policy to which Defendant cites is the policy Defendant followed with respect to Plaintiff since Plaintiff was never made a contingent offer of employment by Tony

---

[5] Plaintiff was considered well qualified for the machinist position. (Docket No. 27 at ¶56). On Defendant's personnel interview form, Tony Stuart noted that Plaintiff had an excellent mechanic background with much training and no perceived weaknesses. (Docket No. 28)

[6] It is unknown when Plaintiff's name was added. (Docket No. 24 at ¶ 25).

Stuart, the employing officer.  (Docket No. 27 at ¶19).

Subsequent to a call from Mr. Stuart, Plaintiff reported to Defendant's offices on November 17, 2004 and met with a police officer as part of the background check and went, as previously instructed, to the Heritage Valley Medical Center in Hopewell for a preplacement physical examination.   (Docket No. 24 at ¶¶ 26-27).  As part of Defendant's medical examination, Plaintiff was required to fill out an extensive medical history where Defendant inquired into whether Plaintiff had a history with respect to twenty-four broad categories of illness and/or injuries.  (Docket No. 27 at ¶ 85).  This questionnaire was contained in Section E on page 81 of Defendant's form MED-15.  *Id.* at ¶ 86.   Plaintiff filled out Section E of the Norfolk Southern Corporation Medical Services form MED-15 at the Heritage Valley Center, and indicated that he had "back pain slight from leaning over vehicles to work on engines" and that "he was taking Oramorph and Vicodin when passing kidney stone", not for chronic back pain.   (Docket No. 24 at ¶¶ 28-31).

Plaintiff signed the form MED-15 right below the paragraph that reads in part "If I am an applicant for employment, I acknowledge that an offer of employment, contingent on satisfactory completion of this medical examination, a urine drug screen and a background investigation, has been made to me."  (Docket No. 24 at ¶ 32).  Plaintiff agrees that he signed the form MED-15, but states that he did not read the above described statement above his signature to which Defendant refers because it was a medical document and Plaintiff is accustomed to just signing medical documents due to his long history of having to sign such documents.  (Docket No. 27, Response at ¶ 32).  Plaintiff also testified that he did not understand he was offered a job when he signed.  (Docket No. 24-2 at p. 27).

In regard to Section F of the MED-15 form completed by Dr. Moon and the note she made "rare sore back pain- no TX or WC", Defendant states that Dr. Moon made this notation because Plaintiff told her that he was not being treated for his back pain.  (Docket No. 24 at ¶¶ 33-34).  Plaintiff argues that Dr. Moon never asked him during the examination if he was being treated for his back pain and that he

6

disclosed that he was on narcotic medication at the time he talked to her. (Docket No. 27 at ¶¶ 34-35). Plaintiff also discussed with Dr. Moon that he had kidney stones within the past few days. *Id.* at ¶ 99. Dr. Moon performed a physical examination of Plaintiff's back and found the results to be normal. *Id.* at ¶ 100. Based on the information conveyed by Plaintiff at the time of Dr. Moon's exam on November 17, 2004, Dr. Moon recommended Plaintiff as qualified. (Docket No. 24 at ¶39).

As part of Defendant's preplacement procedures, Plaintiff provided a urine sample on November 17, 2004 for the purposes of a drug screening, which in turn was tested by Quest Diagnostic and was returned as positive for morphine. *Id.* at ¶¶ 40-41. The results were faxed by Quest Diagnostic to Defendant's Medical Department. *Id.* at ¶ 42. Plaintiff was then notified by the Defendant of the need to contact a Medical Review Officer concerning the urine drug test collected on November 17, 2004. *Id.* at ¶43.[7]

Defendant next asserts that Plaintiff spoke with Dr. Lina in her capacity as a Medical Review Officer on December 14, 2004 and that during this conversation, Plaintiff was advised that he had tested positive for morphine and that Plaintiff then explained that he was taking prescription MS Contin for kidney stones. (Docket 24 at ¶ 44). Plaintiff argues that Dr. Lina only told him that he had tested positive for an opiod or morphine derivative and inquired into whether he had a valid prescription for it, which Plaintiff replied that he did. (Docket 27, Response at ¶ 44). Plaintiff states that he was then instructed to send the prescription to Defendant's Medical Department; however, the reason why Plaintiff was taking the morphine derivative was never addressed during the conversation. *Id.* at ¶ 44. Plaintiff promptly complied. A copy of the prescription written by Dr. Cook for MS Contin/Oramorph was then faxed to Defendant's

---

[7] Defendant contends that it is required under the Department of Transportation Drug Test Guidelines to notify Plaintiff of the need to contact a Medical Review Officer concerning the urine drug test that was collected on November 17, 2004. (Docket No. 24 ¶ 43). Plaintiff disputes that the material Defendant cites (Letter of December 10, 2005 from Allura Henrick to Brian Conto, Exhibit 19) represents such requirement. (Docket No. 27 at ¶ 43).

Medical Department on December 14, 2004, and as a result, the drug test was marked "negative". *Id.* at ¶¶ 45-46.

Contrary to what Dr. Moon allegedly told Plaintiff (Docket No. 27 at ¶ 112), each MED-15 form completed by a physician in the field, such as Dr. Moon, is sent to Defendant's Medical Department for review. (Docket No. 24 at ¶ 47). Sally Heath, one of Defendant's medical standard coordinators was the first person to review Plaintiff's form MED-15. (Docket No. 27 at ¶ 113). Heath reviews the form to ensure whether it's completed, and checks whether there are any "medical issues" with the applicant. *Id.* at ¶ 114. Heath notes any medical issues or problems she discovers on a post-it note in order to call the issue to the attention of the occupation nurse she works with, in this case, Beverly Dozier. *Id.* at ¶ 115. Dozier reviews any medical condition noted on the form MED-15 by the applicant. *Id.* at ¶ 116. With respect to Plaintiff, Heath wrote a note to Dozier stating "back pain. He's on transplant meds, liver transplant 1989, blood pressure recommendation letter." *Id.* at ¶ 117. Heath usually notes when any applicant has back pain because it's a medical problem. *Id.* at ¶ 118. Likewise, Heath noted the liver transplant for Dozier's attention because it's a past medical problem. *Id.* at ¶ 119. Although the form MED-15 specifically mentioned that Plaintiff had a recent issue with kidney stones, Heath did not note such an issue, even though, she also considers kidney stones a medical problem. *Id.* at ¶ 120.

One of Dozier's primary duties is assisting the Medical Director and Associate Medical Director in determining fitness for service and reviewing medical records for employees and applicants. (Docket No. 24 at ¶ 48). In the performance of those duties, she will review MED-15 forms as well as MED-14 forms and often make a determination that additional information is needed for a thorough medical review. *Id.* at ¶ 49. Based on her review of Plaintiff's MED-15 file, Beverly Dozier had Sally Heath, Medical Standards Coordinator, send one of a number of standard letters requesting additional information to Plaintiff. *Id.* at ¶ 50. Dozier wanted all medical records regarding Plaintiff's back pain, including any medications, as well as a statement from his doctor that his back pain and conditions related to his liver

transplant were stable or had resolved, and advising of any recommended work restrictions and/or accommodations. (Docket No. 27 at ¶¶ 123, 124).

In that letter, which went out under Dr. Prible's signature, Plaintiff was asked to provide Defendant's Medical Department with all medical records related to his back pain and have his treating physician provide a written statement indicating that his back pain was stable and has resolved; he was asked to have his treating physician provide a written statement indicating that the condition related to his history of liver transplant was stable; and was advised that his blood pressure of 134/92 exceeded Defendant's Medical Department Guidelines and was encouraged to follow up with his personal physician for a further evaluation, treatment, and control of his blood pressure. (Docket No. 24 at ¶ 51). Notably, this letter does not indicate anything regarding Plaintiff having a contingent job offer. (Docket No. 27 at ¶ 126). Rather, it informs Plaintiff "to allow continued processing of your application for employment with Defendant you must [have your physician provide detailed medical information and records regarding your history of back pain]. *Id.* at ¶ 127. Further, the letter informed Plaintiff if you are unable to provide the necessary documentation within this time period, "your candidacy for employment will no longer be active." *Id.* at ¶ 128.

In response to that request, Dr. Cook sent a letter to Defendant's Medical Department dated January 3, 2005 wherein he enclosed copies of recent health records concerning Plaintiff. (Docket No. 24 at ¶ 52). Further, Dr. Cook informed Defendant's Medical Department that Plaintiff was "extremely stable" with respect to his post-liver transplant condition. (Docket No. 27 at ¶ 132). Dr. Cook also explained that Plaintiff had no liver problems and his medications were working well. *Id.* at ¶ 133. Accordingly, he believed that the liver condition would not affect Plaintiff's ability to work. *Id.* at ¶ 133. Dr. Cook then addressed Plaintiff's history of back pain describing it as: "some history of chronic back pain." *Id.* at ¶ 134. Dr. Cook explained that Plaintiff needed a low dosage of narcotic medication to treat his back pain, but that Plaintiff had been remarkably stable for the past several years. *Id.* at ¶ 135. Dr. Cook further explained that

Plaintiff had not missed a single day of work in the past year due to back pain and that Plaintiff had not shown any signs of over-dependency on the medication. *Id.* at ¶¶ 136-137. Dr. Cook also indicated that since Plaintiff currently works as a mechanic that the back pain and narcotic medication would not limit his ability to work. *Id.* at ¶138. Dr. Cook concluded his letter stating that he would see no reason that Plaintiff's health problems would limit his abilities to perform job functions involving mechanics or engine analysis. *Id.* at ¶ 139.

Dozier reviewed the MED-15 form and results of the drug screen and the information that came in from Dr. Cook, and drew certain aspects of those records to Dr. Lina's attention on January 4, 2005. She noted that the records indicated regular use of narcotics for chronic back pain although that had not been described accurately by Plaintiff. *Id.* at ¶ 54. Dr. Lina reviewed the medical information concerning Plaintiff that was brought to her attention, and her review raised a number of concerns, such as whether or not Plaintiff could perform the essential functions of the job of machinist for which he applied. *Id.* at ¶¶ 55-56. To further address these concerns, Dr. Lina discussed the essential functions of the machinist job with Rick Hill, a supervisor at Conway Yards on January 5, 2005. *Id.* at ¶ 58. Mr. Hill confirmed that the job involved working at heights or elevated platforms, working around moving locomotive engines, moving in and out of the shop and in and out of outdoor fueling areas, operating and controlling the movement of locomotive engines, and, at times, driving company vehicles, mounting and dismounting locomotives; the use of a variety of hand and impact tools; and requiring the machinist to maintain alertness and concentration at all times to avoid injuring himself or others. (Docket No. 24 at ¶ 59). Plaintiff agrees that Hill provided a list of job functions to Dr. Lina, but disputes that these are the essential functions of the machinist job at the Conway shop since Defendant has no written job description for machinists and Dr. Lina did not attempt to determine what the functions were of the machinist position until after it had all of Plaintiff's medical information in its possession. (Docket No. 27 at ¶ 59). Dr. Lina also spoke with Dr. Moon, the examining physician, advising Dr. Moon of the job description and Plaintiff's history of chronic

low back pain which had been confirmed by the records from Dr. Cook. (Docket No. 24 at ¶ 60).

After Dr. Lina spoke with Dr. Moon and advised her of the job description and Plaintiff's chronic history of back pain, Defendant asserts that Dr. Moon agreed with Dr. Lina that Plaintiff was not qualified to work as a machinist and she added that plaintiff was not honest with her during the exam. (Docket No. 24 at ¶ 61). Plaintiff disputes this interpretation and adds that during Dr. Moon's deposition, she testified that she had been aware that Plaintiff was on narcotic medication and people in a safety sensitive position were not allowed to work for Defendant on narcotics. (Docket No. 27 at ¶ 61). She would have wanted Plaintiff to undergo a functional capacity test, with an alertness component, to see if he was capable of doing the job. *Id.* at ¶ 61. Moreover, Dr. Moon testified that she told Dr. Lina that she believed Plaintiff "may" not be qualified to work as a machinist, however, she would have wanted additional information. *Id.* at ¶ 61.

Defendant states that Dr. Lina also spoke with Dr. Cook at which time she discussed Plaintiff's job duties and Dr. Cook clarified Plaintiff's medication use. (Docket No. 24 at ¶ 62). She advised Dr. Cook that based upon the narcotics used by Plaintiff, he did not meet the Defendant's Medical Guidelines for the machinist position, and further advised that for Plaintiff to medically qualify in the future, Plaintiff would need to provide documentation of a substantial time period of stability and control of his pain condition while on a non-narcotic medication program. *Id.* at ¶ 62. Plaintiff admits that Dr. Lina talked to Dr. Cook, but disputes the substance of their conversation. (Docket No. 27 at ¶ 62). Instead, Plaintiff maintains that Dr. Lina told Dr. Cook that Defendant did not allow anyone using narcotic medication to work on their engines, and then Dr. Cook tried to explain that Plaintiff was on a low dosage of narcotic and it would not affect his ability to work. (Docket No. 27 at ¶ 62). In fact, Plaintiff avers that Dr. Cook informed Dr. Lina that Plaintiff could perform all the essential functions of the position with or without reasonable accommodations, despite his history of back pain and liver transplant. (Docket No. 10 at ¶ 12).

However, Dr. Lina concluded that Plaintiff was not medically qualified for the job of machinist as

of January 5, 2005. *Id.* at ¶ 63. Moreover, Dr. Lina concluded that Plaintiff had been dishonest in providing medical information, specifically that Plaintiff was misleading about the treatment required for his chronic back pain and that he had not indicated that his chronic back pain condition required treatment in the form of narcotic medication such as Morphine or Vicodin. *Id.* at ¶ 64. In light of her conclusion that Plaintiff had not been honest with her and with Dr. Moon when providing medical information, Dr. Lina referred the matter to the legal department for consideration of an administrative disqualification, which was noted on the form 4300 on January 10, 2005. *Id.* at ¶¶ 66-67.

Defendant states that Dr. Lina, in making the referral to the legal department, deferred processing a decision on whether or not Plaintiff was medically qualified. (Docket No. 24 at ¶ 67). The referral to Dr. Lina to consider an administrative disqualification of Plaintiff and the information which led to it was reviewed by Phil Piserchia, Director, Agreement and Staffing. *Id.* at 69. Mr. Piserchia, who oversees the recruitment of Defendant's Agreement Employees and their initial training, made the final decision to implement administrative disqualification, as evidenced by his February 8, 2005 letter advising Plaintiff that his job offer had been rescinded. *Id.* at ¶¶ 70-71. However, Plaintiff argues that while Piserchia claims to have made the final review, he has no recollection of what he reviewed in the decision making process, who recommended the decision to administratively disqualify Plaintiff or even when the decision to disqualify was made. (Docket No 27 at ¶ 69). The best Piserchia can say is he believed it had to be something that happened in medical. *Id.* at ¶ 69. Defendant contends that Mr. Piserchia agreed that an administrative disqualification was appropriate, and Plaintiff counters this statement. (Docket No. 24 at ¶ 71; Docket No. 27 at ¶ 71).

Defendant asserts that at some point, Bridget Conto spoke to Sally Heath in Defendant's Medical Department and, in the course of the conversation, was told that Plaintiff's job offer was being rescinded. (Docket No. 24 at ¶ 72). Plaintiff states that Bridget Conto called Heath who told her on January 25, 2005 that Plaintiff had been disqualified from employment for medical reasons. (Docket No. 27 at ¶72). As a

result of this information, Plaintiff called and spoke to Dr. Lina. (Docket No. 24 at ¶ 73).

Defendant states that Dr. Lina discussed with Plaintiff, during their phone conversation, his medical issues with regard to work and advised him before he could ever become medically qualified, he would have to get off of the narcotic medication and document a substantial period of stability and control of his pain without the use of narcotics for a minimum of six months. (Docket No. 24 at ¶ 74). Plaintiff argues that Dr. Lina also told him that they had a strict no drug policy because Plaintiff would be working with tools and working at elevated places where he would not be qualified to work, and that if he got off the narcotic medication for a period of six months Defendant may be able to give him a job. (Docket No. 27 at ¶ 74). Plaintiff also called Tony Stuart to see if there were remaining job openings, evidently to help him decide whether he wanted to stop taking medication. (Docket No. 27, Plaintiff's Response ¶ 76). Stuart then informed Plaintiff that there were no job openings and that the machinist job had been filled the previous week. *Id.* at ¶ 157.

Defendant states that Plaintiff decided since there was no immediate job opening, he would continue to take the narcotic medication. (Docket No. 24 at ¶ 76). Plaintiff discussed alternative medications with his doctor, however, Plaintiff decided to stay on his current medication regimen because (1) Plaintiff is difficult to properly medicate due to his liver condition and the other medications he takes related to his liver (2) there were no job openings and (3) the current narcotic medication Plaintiff was taking allowed him to function well in his daily life as a mechanic. *Id.* at ¶ 76.

Plaintiff considered all of the events that transpired as part of the "hiring process" and never understood that he was only offered conditional employment. (Docket No. 24 at ¶ 77). According to Plaintiff, nobody ever offered him a job before the preplacement physical because he "had to go through all of the stuff" before successfully completing the application process. *Id.* at ¶78. Plaintiff did not achieve a position with Defendant. However, he is currently self employed and is the owner of a company called On-Site Automotive Services which operates out of his home and provides auto diagnosing and repair

services.  (Docket No. 28 at p. 8-9).

Defendant has a policy prohibiting people in safety-sensitive positions from taking narcotic medications while on duty or during specific periods prior to work.  (Docket No. 27 at ¶¶ 164-165).  A safety sensitive position would encompass any position that includes the use of a company vehicle, jobs that require people to work at heights, employees who work with hazardous equipment or machinery around other people.  *Id.* at ¶ 166.  The narcotic ban also applies to any employee or applicant in "non sedentary" positions, which includes any position that is not a "desk-type" job.  *Id.* at ¶¶ 167-168.  A machinist position is considered both safety-sensitive and non sedentary.  *Id.* at ¶ 169.  Further, Tony Stuart claims that all railroad positions are safety-sensitive, including office jobs.  Id. at ¶ 170.

The narcotic policy was created by Dr. Lina with editorial assistance and comments by Dr. Prible.  *Id.* at ¶ 171.  Federal Regulations do not prohibit the use of narcotic medications by people in a safety-sensitive or non-sedentary position.  *Id.* at ¶ 172.  If a safety-sensitive employee needed to take narcotic medication to perform certain functions of his position he would be deemed medically unqualified for the position.  *Id.* at ¶ 173.

Dr. Prible claims the reason for this policy is that narcotics impair alertness and they could be a "set-up" for an accident or incident, and further believes that if someone has had narcotics within six hours of reporting to work , they should not work on engines or with tools.  *Id.* at ¶¶ 175-176.  While Defendant has a blanket policy on narcotic medication, it does not have such a policy for the blood thinner Coumadin.  *Id.* at ¶ 176.  Further, Defendant's medical director admits that someone on Coumadin could be a safety risk to himself, yet the fact that an employee or applicant is on Coumadin would not necessarily disqualify that person from working.  *Id.* at ¶ 177.  Rather a determination would be based on an individualized assessment as to the employee's condition related to Coumadin.  *Id.* at ¶ 178.

Although Defendant has a policy prohibiting the use of narcotic medication by employees and applicants in a safety-sensitive position, there is no specific policy directing current employees to notify

Defendant that they are taking narcotic medication. *Id.* at ¶ 179. Defendant's medical director is unsure whether other railroads have similar policies regarding the blanket prohibition of prescription narcotic medication. Id. at ¶ 180. Plaintiff was not aware of the non-narcotic medication policy when he was seeking a position with Defendant. *Id.* at ¶ 183. Based upon the above cited factual history, Plaintiff brought the instant suit which Defendant now challenges with its motion for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In evaluating the evidence, the court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). While the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324. The nonmoving party "cannot simply reassert factually unsupported allegations contained in its

pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

Pursuant to Local Rule of Court ("LR") 56.1(b)(1), the Defendant must set forth a concise statement of material facts, and the Plaintiff must respond to these statements in accordance with LR 56.1(C)(1). Moreover, pursuant to LR 56.1 (E), "alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." In this case, Defendant set forth a concise statement of material facts (Docket No. 24) and Plaintiff filed a responsive concise statement of material facts (Docket No. 27) which admitted or denied Defendant's alleged facts, and set forth additional allegations. Defendant failed to specifically admit or deny Plaintiff's additional allegations, and therefore the facts set forth in Plaintiff's responsive concise statement of facts are deemed to be admitted by Defendant for the purpose of the instant motion in accordance with LR 56.1 (E). *Smith v. Burrows Corp.*, 2005 WL 2106594 (W.D. Pa. 2005); *Loving v. Borough of East McKeesport*, 2005 WL 3560661 (W.D. Pa. 2005).

Upon reviewing Defendant's Motion for Summary Judgment and brief in support thereof (Docket No. 23, 25), Plaintiff's brief in opposition (Docket No. 29), and Defendant's Reply (Docket No. 30), as well as the updated briefing (Docket No. 37, 38), it is clear that genuine issues of material fact remain in dispute and summary judgment is inappropriate as to certain of Plaintiff's claims. Accordingly, as set forth below, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

## III. ANALYSIS

Defendant argues that summary judgment is appropriate in this case because 1) Plaintiff cannot show that he is "disabled" pursuant to the ADA and PHRA; and 2) Defendant had a legitimate, non-discriminatory reason for rejecting Plaintiff for the job for which he applied on account of Plaintiff's alleged

deceitful conduct. (Docket No. 25 at 1).[8] As to Plaintiff's claims that Defendant violated the ADA's prohibition against pre-offer medical inquiries, Defendant also moves for summary judgment arguing that it had made a contingent offer of employment and accordingly, its requirement of a pre-employment physical was lawful. *Id.* at 1.

Under the ADA, an employer cannot discriminate "against a qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. 12102(2)(a). Discrimination comes in two forms: (1) subjecting the employee to an adverse employment action motivated by prejudice or fear; or (2) failing to provide a reasonable accommodation for a disability. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

In order to establish a *prima facie* case of discrimination under the ADA, Plaintiff must establish that (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job; and (3) he has suffered an adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). A person is disabled pursuant to the ADA if that person has (A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such an impairment; or (C) is regarded as having such an impairment. 42 U.S.C. § 12102(2); 29 C.F.R. § 1620.2(g).

---

[8]

The United States Court of Appeals for the Third Circuit has held that claims under the PHRA are to be analyzed utilizing the same standards that apply to the ADA claims. *See Kelly* v. *Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Therefore, the Court will analyze Plaintiff's claims under the substantive standards of the ADA, but the Court's findings shall apply equally to Plaintiff's PHRA claim.

If a plaintiff satisfies the elements required for a *prima facie* case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Once the employer proffers a legitimate reason for its adverse employment decision, in order to survive summary judgment, the Plaintiff must prove that the employer's stated reasons are pretextual. *Id.* Hence, the plaintiff must present evidence that discredits the employer's proffered reasons, either circumstantially or directly, or adduce evidence, whether direct or circumstantial, that discrimination was a motivating or determinative cause of the adverse action. *Fastold v. Justice*, 409 F.3d 178, at 185 (3d Cir. 2005).

### A. Plaintiff's Disability Claim under the ADA

Plaintiff's amended complaint alleges that he is disabled within the meaning of the ADA because he is substantially limited from performing one or more major life activities; he has a history of such a disability; and Defendant perceived Plaintiff as being substantially limited in performing one or more major life activities. (Docket No. 10 at ¶ 15). However, although Plaintiff pleads all three scenarios under the ADA in which a person is considered disabled, Plaintiff only argues in his brief that Defendant regarded him as having a disability. (Docket No. 29 at p. 4). Moreover, Plaintiff admitted that he is not substantially limited in major life activities. (Docket No. 27 at Response ¶ 9). Due to this admission and Plaintiff's position in his brief, Plaintiff cannot be viewed as "disabled" under the first and second prong of the disability requirements under the ADA. 42 U.S.C. § 12102(2)(A)(B). Accordingly, Defendant's Motion for Summary Judgment is GRANTED, in part, as to Plaintiff's allegations that he is disabled within the meaning of the ADA because he is substantially limited from performing one or more major life activities or has a history of such a disability.

### B. Plaintiff's Regarded as Discrimination Claim under the ADA

While Plaintiff's amended complaint alleges that Plaintiff is disabled as defined by the ADA, Plaintiff concedes that his claim is a "regarded as" claim. (Docket No. 29 at p.4). That is, Defendant

discriminated against him in violation of the ADA by regarding him as having an impairment. A person is "regarded as" having a disability if the person: (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation; or (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or has [no such impairment] but is treated by the covered entity as having a substantially limiting impairment. See C.F.R. § 1630 2(1).

The phrase "substantially limits" means "'unable to perform a major life activity that the average person in the general population can perform' or 'significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Mondzelewski v. Pathmark Stores*, 162 F.3d 778, 782-83 (3d Cir. 1998) (citations omitted). In assessing whether a major life activity is substantially limited, a court should consider the following factors: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of [the impairment] or resulting from the impairment." *Id.* at 783. Major life activities include "'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning'" sitting, standing, reaching and working, although this list is not exhaustive. *Id.* at 783 *citing* 29 C.F.R. § 1630.2(I). Here, the focus is on the major life activity of working.

The Supreme Court has noted that the terms "substantially" and "major", as used in the ADA provision defining disability, "need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002). Similarly, the Third Circuit Court of Appeals has held that: "[t]he purpose of the ADA would be undermined if protection could be claimed by those whose relative severity of impairment was widely shared." *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 185-86 (3d Cir. 1999).

19

Turning to the case at hand, Plaintiff claims that Defendant regarded him as disabled because of a perceived physical impairment that Defendant found prevented him from working as a machinist for the railroad. With regard to the major life activity of working, a court must look to whether an individual is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. Pt. 1630, App. § 1630.2(j)(3)(I); *E.E.O.C. v. Heartaway Corp.*, 446 F.3d. 1156, 1162 (3d Cir. 2006). As this regulation suggests, a court must consider the individual's training, skills, and abilities to evaluate "whether the particular impairment constitutes for the particular person a significant barrier to employment." *Mondzelewski*, 162 F.3d at 784; *see also* 29 C.F.R. 1630, App. § 1630.2(j) (determination of whether individual is limited in working must be conducted on case-by-case basis). Because a "'person's expertise, background, and job expectations are relevant factors in defining the class of jobs used to determine whether an individual is disabled. . . the court must consider the effect of the impairment on the employment prospects of that individual with all of his or her relevant personal characteristics. . . Thus, a substantially limiting impairment for one individual may not be substantially limiting for another individual with different characteristics.'" *Mondzelewski*, 162 F.3d at 784 (citations omitted).

Accordingly, to be substantially limited in the major life activity of working, one must be precluded from more than one type of job, a specialized job or a particular job of choice. *Sutton*, 527 U.S. at 492. In order to determine what constitutes a "class of jobs" one must consider that a person " is nevertheless disabled if one is significantly restricted in one's ability to perform most of the jobs in one's geographical area that utilize training, knowledge, skills, and abilities similar to the job one has been disqualified from performing." *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751 (3d Cir. 2004).

Proving that the employer thought that Plaintiff's perceived disability would prevent him from performing a broad class of jobs or jobs in various classes is embedded almost entirely in the employer's subjective state of mind. *Heartaway*, 446 F.3d at 1162. Furthermore, although the above inquiry is

strongly subjective, the question of what constituted a "class of jobs" or "broad range of jobs in various classes" is an objective question...there need not be evidence that the employer knew or believed that the group of jobs from which the employer viewed the employee as restricted constituted a "class of jobs" or a "broad range of jobs in various classes."[9]  *Id.*

The record reflects that Plaintiff is of limited educational background, has had automotive and welding training, and worked as a mechanic and laborer.  (Docket No. 28 at p. 20; Docket No. 27 at ¶¶ 10, 12).  The record also reflects that Plaintiff has residual back pain that originated from an automobile accident and persists due to the demands of being a mechanic, such as leaning over vehicles in order to work on their engines.  (Docket No. 27 at ¶¶ 33,91).  Courts have held that residual neck and arm pain, originating from an accident, that affects musculoskeletal system and back strains are deemed impairments for the ADA purposes.  *Martinelli v. City of Erie*, 216 F.3d 354, 360 (3d Cir. 2000); *Plant v. Morton, Int'l*, 212 F.3d 929, 937 (6th Cir. 2000).  However, a mere diagnosis of a physical impairment does not render one disabled under the ADA.  *Toyota Motor Mfg., Kentucky, Inc. V. Williams*, 534 U.S. 184, 195 (2002).

Hence, Plaintiff must also establish that his physical condition did not specifically limit his major life activities.  In evaluating whether Plaintiff's back impairment does not substantially limit him in performing a major life activity, such as working, the Court must assess the alleged limitation in light of any corrective or mitigating measures Plaintiff has taken with respect to his impairments.  *Fiscus v. Wal-Mart*, 385, F.3d 378, 385-86 (3d Cir. 2004) (citing *Sutton v. United States Air Lines, Inc.*, 527 U.S. 471, 488 (1999)).  However, this evaluation must also take into account any side effects or other collateral limitations that are caused by the corrective measures employed by the Plaintiff.  *Id*.

Dr. Cook, Plaintiff's physician, explains that Plaintiff's back pain requires him to take a low dosage

---

[9]

The EEOC regulations and interpretive guidance state that "heavy labor jobs", "jobs that involve manual labor," "semi-skilled jobs" are classes of jobs.  *E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1163 n.6 (10th Cir 2006).

of narcotic medication so that he can function in his daily life as a mechanic. (Docket No. 27 at ¶ 135). Plaintiff contends, and Defendant does not dispute, that the narcotic medicine Plaintiff needs to take in order to treat his back pain and function in his daily life is a corrective measure and therefore should be considered in assessing whether Plaintiff is substantially limited as well as whether Defendant regarded Plaintiff as being substantially limited in performing a major life activity. (Docket No. 29 at p. 9).

As evidence that genuine issues of material fact exist as to Plaintiff's allegation that Defendant regarded Plaintiff as having a disability that substantially limited him in working, Plaintiff relies on Defendant's medical policy prohibiting workers in a safety-sensitive position from taking narcotic medication while on duty or during a specific period prior to work. (Docket No. 29 at p. 9).[10] A safety-sensitive position would encompass any position that includes the use of company vehicles, jobs that require people to work at heights, employees who work with hazardous equipment or machinery around other people. (Docket No. 27 at ¶ 166). This narcotic ban policy also applies to any employees or applicant in "non-sedentary" positions, which is any position that is not a "desk type" job. (Docket No. 27 at ¶¶ 167-168). A machinist position is considered both a "safety-sensitive" and "non-sedentary" position. (Docket No. 27 at ¶ 169). Accordingly, Defendant would disqualify any such employees in "non-desk-type" jobs from employment even if they need narcotic medication to be able to perform the functions of their job. (Docket No. 29 at p. 9).

Defendant disputes Plaintiff's interpretation of its narcotics policy "to the extent that Plaintiff's Brief in Opposition cites Defendant's Fee-For Service Provider Manual as a statement of Defendant's narcotics policy, such is not the case." (Docket No. 30 at p. 5). Instead, Defendant claims that Dr. Prible testified at his deposition that the narcotics policy applies to only those in a safety sensitive position, not

---

[10] This Court declines to address Plaintiff's arguments regarding whether Defendant's medical policies on narcotic use violate and undermine the ADA at this time. (Docket No. 29, at p. 9-10). Moreover, the Court notes that Plaintiff's Amended Complaint does not make such allegations. (Docket No. 10).

all employees, except those in certain type desk jobs, and that the Fee-For Service Provider Manual merely gives guidance to physicians, not necessarily states the exact policies. *Id*. However, Plaintiff asserts that the policy and Dr. Prible's deposition testimony show that the policy also applies to employees in a "non-sedentary position", which Dr. Prible defines as any position that is not a "desk-type" job.

It is axiomatic that factual determinations are the sole province of the jury. *Rohm and Haas Co. v. Continental Cas. Co.*, 781 A.2d 1172, 1181 (2001). Furthermore, credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Reeves v. Sanderson Plumbing Products, Inc*. 530 U.S. 133, 150 (2000). Here, in order to determine what positions and employees to whom Defendant's narcotics policy applies, the jury must assess Dr. Lina's and Dr. Prible's testimony against what is stated in the Fee-For Service Manual as the relevant inquiry relates to the perception, or intent, of the employer. *See Eshelman v. Agere Systems, Inc.* 397 F.Supp. 2d 557, 665 (E.D. Pa. 2005).

Defendant further argues that the record does not show that Defendant, as the employer, viewed Plaintiff as unable to perform a broad class of jobs, but rather that Defendant regarded him as someone who because his use of narcotic medication, was ineligible for certain safety-sensitive positions, specifically the machinist position. (Docket No. 39 at p. 16-17). Defendant's counsel stated in oral argument that it believed that eliminating Plaintiff from consideration for any machinist job, and even other jobs from the railroad is still not broad enough to satisfy the "substantially limited" legal standard. (Docket No. 39 at p. 11). He asserted that railroad jobs are a narrow class of jobs that have unique aspects in a highly dangerous industry. *Id*. Furthermore, Defendant urges that it had a legitimate nondiscriminatory reason for not hiring Plaintiff since he was allegedly deceitful on his medical form and in his discussion with the examining doctor, Dr. Moon. (Docket No. 24 ¶¶ 29, 31).

In response, Plaintiff argues that although Defendant states it did not hire Plaintiff due to his alleged dishonesty, Defendant does not deny that it determined Plaintiff was not medically qualified to work as a

23

machinist due to its medical guidelines involving narcotic medication. (Docket No. 24 at ¶¶ 62-62, 71). Analyzing Defendant's narcotics policy, Plaintiff suggests that a reasonable jury could infer that Defendant perceived Plaintiff as not being substantially able to perform a class of jobs or broad range of jobs, not simply the discrete position of machinist. (Docket No. 29 at p. 14). Plaintiff alleges that the narcotics policy not only prohibited Plaintiff from working as a machinist, but also precluded him from working in all "non-sedentary" and all "safety-sensitive" positions, which incorporated any positions with the Defendant that are "physically demanding", since the only types of jobs not excluded were "desk type jobs", in which he was not qualified. (Docket No. 29 at p. 14).

Plaintiff relies on Dr. Lina's testimony that Defendant's narcotic policy prohibited people on chronic pain medication from working on Defendant's engines and that he was not being hired because he was on narcotic pain medication and would be required to work at elevated positions and with tools. (Docket No. 29 at p. 14). Moreover, Defendant's medical director, Dr. Prible testified that people should not work on engines or with tools within six hours of using narcotic medication. *Id*. The Court additionally notes that although Defendant's narcotic policy bans narcotic use within a minimum of six hours of reporting to work or while on duty, under its Commonly Prescribed Medication and Guidelines, it states that ultram, a narcotic medication, does not fall into this category. (Docket No. 28 at p. 127).[11] Further, Dr. Cook wrote to Plaintiff that ultram may be a option for him, but that Dr. Cook personally believed that the pain medications that Plaintiff was already taking were working well, and that his pain medication options were limited due to his liver disease. (Docket No. 28 at p. 120). Dr. Cook also mentioned that he tried to

---

[11]

The Commonly Prescribed Medications and Guideline document states "May use within six hours of reporting to work and while on duty if his/her treating physician provides to Defendant's Medical Department a written statement indicating that the underlying medical condition is controlled, that the medication is prescribed, that the employee has been taking the medication on a chronic basis, that the treating physician is familiar with job requirements and that the employee is not experiencing adverse side effects for medication that would prevent safe performance of duties." (Docket No. 28 at p. 127).

convince Defendant that Plaintiff was on a low dose of pain medications and that it should not affect his work. *Id.*

Plaintiff additionally argues that in order to determine whether Plaintiff was substantially limited within a class of jobs, a court must consider Plaintiff's limited education, and the fact that his work experience is restricted to the mechanical trade and work as a laborer. (Docket No. 29 at p. 15). After taking Plaintiff's background into consideration, including the fact that he was not educationally qualified for a desk job, precluding Plaintiff from working with tools and at heights on engines, a fact finder could infer that Defendant substantially limited Plaintiff from a broad range or class of jobs with the railroad. (Docket No. 39 at p. 35-36). [12]

Plaintiff further argues that Defendant's narcotics policy violates the ADA and raises material issues of fact whether Defendant regarded Plaintiff as substantially limited in his ability to work. (Docket No. 29 at p.9). Plaintiff highlights that individualized assessments should be invoked to further one of the purposes of the ADA; protecting people with disabilities from unfair and inaccurate stereotypes. *Id.* (citing *Bombrys v. City of Toledo*, 844 F. Supp. 1210, 1219-1220 (N.D. Ohio 1993)). Hence, Plaintiff asserts that Defendant's narcotics policy undermines this purpose of the ADA because Plaintiff, a prospective job applicant who takes legally prescribed, low dosage narcotic medicine to treat his back pain, was ruled ineligible for employment without ever being afforded an individual assessment to determine his actual ability to do the job for which he applied. (Docket No. 29 at p. 11).

Defendant counters Plaintiff's assertions concerning its alleged failure to perform such individualized assessment by arguing that the record shows that Dr. Lina did, in fact, perform an individual assessment on Plaintiff. (Docket No. 30 at p. 3). "Dr. Lina reviewed Plaintiff's medical records, discussed

---

[12] This Court, under Judge Hardiman, after hearing Defendant's and Plaintiff's oral arguments, appeared to agree that limiting a person with Plaintiff's background from using tools, would satisfy the prima facie case. (Docket No. 39 at p. 37).

the essential functions of the machinist job with Rick Hill, and spoke with Plaintiff's treating doctor (Dr. Moon) and examining doctor (Dr. Cook) before determining that he was not medically qualified for the job of machinist." *Id.*

Whether Defendant satisfied or violated the requirements under the ADA as to performing an individual assessment on Plaintiff is a question of fact. Specifically, it is a question of fact whether Dr. Lina's personal review of Plaintiff's medical records and her discussion with the various doctors, instead of performing an assessment on Plaintiff herself, amounted to an individual assessment under the ADA. Moreover, Dr. Moon testified that she would have wanted Plaintiff to undergo a functional capacity test, with an alertness component, to see if he was capable of doing the job. (Docket No. 27 at ¶ 61).

Thus, the Court finds that genuine issues of material fact exist regarding whether Plaintiff was "regarded as" having a disability that substantially limits a major life activity, *i.e.* work.

### C. Pretext

Assuming *arguendo* that plaintiff has made out a prima facie case, the burden then shifts to defendant to articulate a legitimate non-discriminatory reason for rejecting plaintiff's job application. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "This burden is 'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006), *citing Fuentes*, 32 F.3d at 763. Once Defendant articulates a nondiscriminatory reason, Plaintiff must respond by citing evidence that the rationale is pretextual. *Fuentes*, 32 F.3d at 763. If a plaintiff demonstrates that the reasons given for an employer's employment action did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext, though of course, it should be considered in light of the entire record. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 284 (3d Cir. 2001). In order to create a genuine issue of material fact as to whether the proffered reason is pretextual, Plaintiff

must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve Defendant's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Plaintiff's job elimination and termination. *See Fuentes*, 32 F.3d at 764.

Defendant maintains that even if Plaintiff can establish a prima facie case, because he cannot show that Defendant's legitimate nondiscriminatory reason for revoking its conditional job offer, that Plaintiff lied on his new hire medical examination, is a pretext for discrimination, summary judgment is appropriate. (Docket No. 30, at p. 6). Defendant argues that it is well settled in the Third Circuit that falsification of an employment application is a legitimate, nondiscriminatory reason for adverse employment action, such as refusing to hire a potential employee. *Diberardinis-Mason v. Super Fresh*, 94 F.Supp.2d 626 (3d Cir. 2000). For example, Defendant maintains that Plaintiff was dishonest on his Form MED-15 when he indicated he had "back pain slight from leaning over vehicles to work on engine" and he was taking "Oramorph and Vicodin when passing kidney stones", since Plaintiff had chronic back pain and was taking the narcotic medicines to treat this pain. (Docket No. 24, at ¶ 28-29). [13]

Plaintiff counters that summary judgment should be denied, in part because there are "weaknesses, implausibilities, inconsistencies, or contradictions" that undermine Defendant's alleged nondiscriminatory legitimate reasons for not hiring Plaintiff. (Docket No. 29 at p. 16). Specifically, Plaintiff argues that although Defendant asserts that Plaintiff was rejected because he was deceitful during his preemployment process, Defendant's reasons have "evolved into this explanation." (Docket No. 29 at p. 16-17).

In support of this position, Plaintiff directs the Court to the following facts of record: Plaintiff

---

[13] Defendant argues that Plaintiff's untruthfulness is further illustrated by the fact that he failed to orally report this information to Dr. Moon and told her that he was not being treated for back pain despite the fact that he was taking narcotic medication for his back pain. (Docket No. 24, at ¶ 34, 36). Plaintiff disputes these contentions, arguing that Dr. Moon never asked him if he was being treated for his back pain and that he disclosed he was on narcotic medicine at the time he talked to her. (Docket No. 27, Response to Defendant's Concise Statement of Facts, at ¶34-35).

states, and Defendant does not dispute that, as of January 5, 2005, Dr. Lina came to the conclusion that Plaintiff was not medically qualified for the job of machinist. (Docket No. 30, at p. 6). During a phone conversation on January 5, 2005, Dr. Lina told Dr. Cook that Plaintiff was rejected because Defendant had a strict narcotics policy banning people on narcotic medication from working on their engines. (Docket No. 27, at ¶ 143). Later, Sally Heath told Bridget Conto on January 25, 2005, that Conto had been medically disqualified for employment and asked whether they had received the disqualification letter.[14] (Docket No. 27, at ¶147-148). That same day, as Heath instructed, Plaintiff called Dr. Lina to inquire why he had not received the job. *Id.* at ¶150. Dr. Lina told Plaintiff the same reason that she had expressed to Dr. Cook and additionally mentioned that if Plaintiff got off the narcotic medication for a period of six months, Defendant may be able to give him a job. *Id.* at ¶154.[15] After Plaintiff finished speaking to Dr. Lina, he called Tony Stuart, and Stuart informed him that there were no jobs available and that the machinist job had been filled the previous week. *Id.* at ¶ 157. Plaintiff was not informed that he was rejected for the job due to dishonesty until he received a letter from Philip Piserchia, Defendant's Director of Employment, dated February 9, 2005. *Id.* at ¶ 159.[16]

Defendant asserts that there is evidence prior to February 9, 2005 that supports Defendant's decision to administratively disqualify Plaintiff for his dishonesty, such as the fact that the referral by Dr. Lina for consideration of an administrative disqualification was noted on the form 4300 on January 10, 2005.[17] (Docket No. 24 at ¶ 68). Furthermore, Defendant also argues the evidence upon which Plaintiff

---

[14] The parties dispute the substance of this conversation.

[15] Dr. Lina told Plaintiff that he was not getting the job because of the prescription he was taking. *Id.* at ¶ 151. Further, Dr. Lina told Plaintiff that Defendant had a strict no drug policy because he would be working with tools and working at elevated places. *Id.* at ¶ 152.

[16] Plaintiff alleges that Piserchia cannot say when he made the decision, who recommended the administrative disqualification, what materials were reviewed in making the decision, and with whom he discussed the administrative disqualification. Indeed, Piserchia does not even know what specific information caused Plaintiff to be disqualified. (Docket No. 27 at ¶ 160).

[17] During oral argument, counsel to the parties indicated that they were not clear exactly when the job

28

relies, such as the information Dr. Lina relayed to Dr. Cook and Plaintiff, and what statements were made by Sally Heath. (Docket No. 30 at p. 7-8).

As stated above, to survive summary judgment, a plaintiff need only present evidence from which a reasonable factfinder could conclude either that the defendant's proffered reasons are not worthy of credence or that the real reason for the decision was discrimination. *Fuentes*, 32 F.3d at 764. While there is some evidence in the record with regard to Defendant's reason for not hiring Plaintiff, i.e. Plaintiff's dishonesty, there is also evidence to the contrary. Further, the Court notes that Plaintiff promptly provided information as to his narcotic prescriptions, when requested. (Docket No. 27 at ¶¶ 109-110.) Hence, a reasonable factfinder could also determine that Defendant's employment decision, given its timing, was pretextual. *See Torre*, 42 F. 3d at 833. Looking at the facts in the light most favorable to Plaintiff, as the Court must, and drawing all reasonable inferences in his favor, the evidence proffered by Plaintiff could potentially persuade a reasonable jury that Defendant's reasons for not hiring Plaintiff were pretextual Accordingly, Defendant's Motion must be denied.

### D. Defendant's Medical Inquiry and Examination/ Conditional Offer of Employment

Under the ADA, an employer, cannot until an offer of employment has been made, "conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability." 42 U.S.C. § 12112(d)(2)(A). Plaintiff alleges Defendant conducted a medical examination and made inquiries of Plaintiff as to whether he is an individual with a disability, and concerning the nature and severity of that disability, and therefore discriminated against him in regard to job application procedures in violation of the ADA. (Docket no. 10 at ¶ 18). Defendant asserts it had already given Plaintiff a conditional/contingent offer of employment before initiating any medical inquiry and

---

Plaintiff applied for was filled and that it had not been established who had checked administrative disqualification on the Form 4300. Moreover, it should be noted that Judge Hardiman questioned whether this evidence helped Defendant since there was a substantial amount of follow up with Dr. Lina after this date. (Docket No. 39, at p. 54-55).

examination. (Docket No. 25 at p. 14).

Plaintiff asserts in his deposition testimony that he was never given a job offer contingent upon passage of a medical exam after his initial interview at the Greentree hiring session. (Docket No. 27 at ¶ 62). Plaintiff also alleges that Defendant never gave him a "start date." *Id.* At ¶ 74. Moreover, Plaintiff emphasizes that Defendant's own documents which refer to Plaintiff as an "applicant" and references "his 'candidacy' for employment" and discusses "continued processing of his application" in a letter it sent to him after the medical examination as evidence that a conditional offer of employment never existed. (Docket No. 28 at p. 97). Although Defendant produces two documents, the pre-offer application for employment and the form MED-15 (Docket No. 24 at ¶ 32), both of which contain "contingent" language, Plaintiff counters that this language was never fully explained to Plaintiff and that he did not understand the meaning of the word "contingent, especially since he was unable to read this word during his deposition. (Docket No. 29 at p. 22).

Defendant highlights the following facts in the record to show that Plaintiff had a conditional job offer prior to any medical inquiry or exam. Defendant proffers that Plaintiff was well aware that he had received a conditional offer since the contingent language was evidenced in Defendant's corporate policy which is set forth on the application that Plaintiff filled out and was administered through an orientation "script" at the hiring session he attended, as well as appearing on the form MED-15 which Plaintiff signed. (Docket No. 25 at p. 15). Additionally, Tony Stuart testified that he made Plaintiff a conditional offer on the same day he interviewed him. *Id.* Plaintiff counters this assertion by contrasting Tony Stuart's testimony with that of Scott McGrain, who testified that he did not recall Plaintiff being given a conditional offer during the interview. (Docket No. 27, Response at ¶ 32).

As stated above, there are genuine issues of material fact concerning whether Defendant made a conditional/contingent offer of employment to Plaintiff. Accordingly, Defendant's motion for summary judgment as to this issue is also denied.

**III. CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. An appropriate order follows.

BY THE COURT:

_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: December 11, 2007

cc/ecf: all counsel of record